IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CELL PHONE USING PHONE NUMBER (828) 371-0209, AND CURRENTLY BEING UTILIZED BY BRENT HUGGINS | Case No. 1:22-mj-00047 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, **Kevin Allred,** being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of property, described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives (ATF). I have been so employed since March 2016. I am currently assigned to the Asheville North Carolina Satellite Office after transferring from the Baton Rouge Field Office. As an ATF Special Agent, I am responsible for conducting investigations of Federal firearms laws, explosives laws, and arson laws. I am a graduate of University of North Carolina at Charlotte, the Charlotte Mecklenburg (NC) Police Department training academy, the Federal Law Enforcement Training Center, ATF Criminal Investigator Training Program and National Academy, and the Special Agent Basic Training School.

3. During my tenure with ATF I have been involved in various degrees and capacities with numerous investigations, including: the illegal possession of firearms by convicted felons; the theft of firearms from federal firearms licensee's: the possession and use of firearms by narcotics traffickers; illegal sale or possession of machineguns and short-barrel shotguns or rifles; arsons of structures which affect interstate commerce; the manufacturing and dealing of firearms without a license and the manufacturing; and possession or use of illegal explosive devices.

4. Prior to joining the ATF, I was a Charlotte Police Department officer and detective for approximately 15 years. As a Charlotte Police officer and detective, I participated and led investigations involving vehicular homicides, narcotics, and other violent crimes.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6. The property to be searched is a cellphone with assigned telephone number (828) 371-0209 (hereinafter "the DEVICE"), which is currently being utilized by Brent HUGGINS.

7. The applied-for warrant would authorize the forensic examination of the DEVICE described in Attachment A for the purpose of identifying electronically stored data particularly described in Attachment B.

8. HUGGINS is being investigated for violations of 18 U.S.C. § 922(a)(6), false statement as to a material fact to Federal Firearms Licensee (FFL); 18 U.S.C. § 922(a)(1)(A),

dealing firearms without a license; 18 U.S.C. § 922(a)(5), transfer to out of state resident; and, 18 U.S.C. § 922(d)(1), sale/transfer to a prohibited person.

## PROBABLE CAUSE

9. In May 2022, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) began investigating Brent HUGGINS after becoming aware that HUGGINS had purchased a large number of firearms from various federal firearms licensees in the Western District of North Carolina. Since March 8, 2022, HUGGINS has purchased at least 78 firearms - 22 of which were Taurus 9mm pistols.[1] ATF records show that HUGGINS has purchased eight firearms that were later seized by police during criminal investigations. The firearms were seized in North Carolina, Tennessee, Georgia, Massachusetts, and the District of Columbia.

10. Given the quantity of firearms purchases being made by HUGGINS, ATF Special Agent (SA) Kevin Allred requested an official query of the Federal Firearm Licensee system to determine if HUGGINS was a valid Federal Firearms Licensee (FFL). A review of the query showed that HUGGINS is not an FFL and there is no record that he ever has been.

11. Also in May 2022, an FFL in the Western District of North Carolina made a report to ATF about suspicious purchases placed by HUGGINS. The paperwork that HUGGINS had filled out in order to purchase firearms at the FFL listed 83 Skyview Lane in Franklin, North Carolina as HUGGINS' home address. The FFL also provided the phone number that HUGGINS had used in communication with the FFL for previous firearm purchases. The phone number provided was, (828) 371-0209.

---

[1] Agents are only able to research and view multiple sale purchases made by HUGGINS using the ATF database, Etrace. This database only captures data when a purchaser purchases two or more handguns within a five-day period.

3

12. On May 17, 2022, ATF SA Kevin Allred, acting in an undercover role, texted the phone number associated with HUGGINS in order to attempt to set up an undercover buy. After communicating by text message, HUGGINS called SA Allred. During the call, HUGGINS identified himself as "Brent." HUGGINS informed SA Allred that people love the Taurus pistols, and that HUGGINS has a hard time getting them. HUGGINS stated that he hoped to have more firearms the following morning. HUGGINS stated that as soon as he gets handguns, they are gone. HUGGINS stated that he could get SCCY pistols the next day and that they generally sell for about $310.00. HUGGINS stated he was not positive on the price because every time he goes into the FFL, they change the price on him. HUGGINS said that he would call SA Allred before HUGGINS got a SCCY pistol.

13. On May 21, 2022, a Drug Enforcement Administration (DEA) Task Force Officer (TFO) went out to 83 Skyview Lane, Franklin, North Carolina. The DEA TFO took a video of the driveway of HUGGINS' residence. A red Jeep Liberty was parked in the driveway of HUGGINS' residence. The registration plate is not visible in the video.

14. On May 21, 2022, HUGGINS texted SA Allred and said, "hey. Glock 30 with 200 fmj brass 45 shells 7.50…good deal!" SA Allred then placed a phone call to HUGGINS. HUGGINS advised that the Glock would cost $750.00. HUGGINS stated that he should get a SCCY pistol the first of the following week. During this call, HUGGINS advised that he would be driving a Jeep Liberty and would open the back and allow SA Allred to pick out whatever firearms he wanted to purchase.

15. On May 22, 2022, HUGGINS called SA Allred. HUGGINS arranged to meet SA Allred on May 23, 2022, at the Huddle House in Sylva, North Carolina. During the phone call HUGGINS stated he still had the Glock. HUGGINS said he might have more firearms and that

4

he might get a SCCY pistol in time for their arranged meet but would not know until that morning.

16. On May 23, 2022, SA Allred met with HUGGINS in the parking lot of the Huddle House in Sylva, North Carolina. SA Allred purchased two firearms from HUGGINS, who also had approximately eight long guns in his vehicle for sale. SA Allred purchased a Glock pistol and a Huglu 12-gauge shotgun from HUGGINS. HUGGINS advised he had been in possession of the Glock for about four or five days and that he had been holding onto the shotgun for about a week and a half. SA Allred asked about purchasing more firearms and HUGGINS advised he should have some more that week. SA Allred inquired as to HUGGINS having more handguns to sell, HUGGINS stated that he did not. SA Allred asked HUGGINS if HUGGINS could obtain a Taurus, model Judge for SA Allred.

17. At the time of the May 23, 2022, purchase, HUGGINS was driving a 2005 Jeep Liberty bearing North Carolina registration plate PBK-9509. The registration on the vehicle was expired. The Jeep was registered to Constance Blanton Huggins at 83 Skyview Lane, Franklin, North Carolina.

18. After the May 23, 2022, purchase was completed, ATF SAs surveilled HUGGINS as he drove the Jeep directly to the Grumpy Old Men Trading Post located at 1370 Main Street, Bryson City, North Carolina. While at the Grumpy Old Men Trading Post, HUGGINS met with an individual whose identity is known to ATF agents. Agents observed HUGGINS take a long gun inside the Trading Post and exit without it. This location and an individual associated with this location have been under ATF investigation for dealing firearms without a license.

19.     On May 25, 2022, HUGGINS sent a text message to SA Allred stating that HUGGINS should have a Taurus or SCCY pistol later that day. HUGGINS stated that he would let SA Allred know when HUGGINS had them so that SA Allred could purchase them.

20.     Also on May 25, 2022, HUGGINS called SA Allred to inquire if SA Allred really wanted the Taurus Judge pistol. HUGGINS stated he wanted to know before HUGGINS bought it. HUGGINS advised it would be $710.00. HUGGINS stated the Taurus Judge would be brand new and in the box. HUGGINS also agreed to sell SA Allred a Taurus G2C pistol that was brand new and in the box for $360.00. SA Allred obtained the ATF-4473 from Jeff's Ammo and Arms, indicating that HUGGINS purchased a Taurus, model G2C 9mm pistol bearing serial number ADD223423 on May 24, 2022. SA Allred discovered that HUGGINS had paid $250.00 for the Taurus G2C. The ATF-4473 forms from Jeff's Ammo and Arms showed that HUGGINS also purchased a Taurus, model Public Defender Judge, .410/.45 caliber revolver bearing serial number ACK442355 on May 25, 2022, and SA Allred was able to determine that HUGGINS had paid for $558.00 for it.

21.     On May 26, 2022, HUGGINS met SA Allred at the Huddle House in Sylva, North Carolina. HUGGINS drove the Jeep to the deal. HUGGINS sold SA Allred four firearms, to include the Taurus purchased on May 25, 2022, and the Taurus purchased on May 24, 2022. The firearms were removed from the vehicle and sold to SA Allred. HUGGINS agreed to obtain additional firearms for SA Allred and SA Allred's friends. HUGGINS stated that he was glad SA Allred was not the ATF setting him up. SA Allred talked to HUGGINS about obtaining an AR-15 rifle.

22.     After the purchase, HUGGINS then went to the Grumpy Old Men Trading Post located at 1370 Main Street, Bryson City, North Carolina. HUGGINS left Grumpy Old Men

6

Trading Post and drove to Jeff's Ammo and Arms and purchased three firearms. HUGGINS then went to Thunder Pawn and was seen loading something into the Jeep. HUGGINS then drove to the area of his residence.

23. On May 28, 2022, and May 30, 2022, SA Allred communicated with HUGGINS via text message and phone calls. SA Allred texted HUGGINS that SA Allred had a friend who lives in South Carolina and who was interested in purchasing a firearm from HUGGINS. SA Allred also told HUGGINS the same on a recorded phone call. After telling HUGGINS, HUGGINS offered to meet SA Allred and his friend in South Carolina to make it easier.

24. On May 31, 2022, acting in undercover roles, SA Allred and another ATF SA met with HUGGINS at the Huddle House in Sylva, North Carolina. HUGGINS was operating the Jeep. During the meeting, the undercover ATF SA again told HUGGINS that he was from South Carolina. HUGGINS sold the undercover ATF SA an AR-15 style rifle, and a Smith and Wesson, 9mm pistol. HUGGINS sold SA Allred an EAA imported .38 special revolver. All three firearms were new and in the box.

25. On June 13, 2022, SA Kevin Allred and ATF Confidential Informant 17856 [2] met with HUGGINS at the Huddle House in Sylva, North Carolina. ATF CI 17856 is a convicted felon. CI 17856 notified HUGGINS that he had a "felony" and HUGGINS replied, "I don't know you, you name is George? (chuckling)" HUGGINS sold SA Allred a Sarsilmaz, model SAR9, 9mm pistol bearing serial number T1102-20BV84884. HUGGINS sold CI 17856 a

---

[2] The true identity of the CI 17856 is known to law enforcement but for safety reasons and to preserve an ongoing investigation the CI's identity is not included here.

Smith and Wesson, model M&P 9 Shield M2.0, 9mm pistol bearing serial number JNN5697 and a Keltec, model Sub2000, 9mm rifle bearing serial number FGKK22.

26. On June 17, 2022, HUGGINS texted SA Allred "Hey buddy I have a brand new ak with 2 30 rd. Clips !! 1290!! Also extra clips and I have ammo". HUGGINS also sent a picture of the firearm. Later in the day HUGGINS texted "No paper trail at all ! Even on me. I did 2 Monday same man". This text was in response to SA Allred talking about flipping firearms for some extra money.

27. On July 7, 2022, HUGGINS texted SA Allred, "Hey buddy . not much to get. I do have a ak47 wood 2clips".

28. On July 12, 2022, HUGGINS texted "What are you trying to sell".

29. SA Allred obtained copies of the ATF-4473 forms filled out by HUGGINS on May 24, 2022; May 25, 2022; June 8, 2022; and June 9, 2022. These forms were completed by HUGGINS on firearms that he purchased from legitimate FFLs and sold to an undercover ATF agent and/or CI 17856. The ATF-4473 forms are filled out by the purchaser of the firearm and included information for a thorough background check can be completed. On all the forms, HUGGINS checked yes to question 21a: "Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.** Exception: If you are only picking up a repaired firearm(s) for another person, you are not required to answer 21.a. and may proceed to question 21.b." These purchases were conducted in violation of 18 U.S.C. § 922(a)(6), providingch a false statement to a FFL for a material fact.

8

30. A check of North Carolina Department of Motor Vehicles showed that HUGGINS was issued driver's license number 37536750 on December 30, 2015. The address on HUGGINS' driver's license is 83 Skyview Lane, Franklin, North Carolina. Additionally, the photo attached to the driver's license matches the individual (HUGGINS) SA Allred purchased multiple firearms from.

31. In May 2019, HUGGINS was previously investigated for dealing firearms without a license. During the investigation, HUGGINS was interviewed by ATF SAs and admitted to buying and selling firearms. During the May 2019 investigation HUGGINS told SAs that he would not do it again. At the time, an ATF SA explained federal violations and the potential penalties for dealing firearms without a license. Agents verbally warned HUGGINS to cease and desist dealing firearms without a license. HUGGINS was served with a "Notice of Unlicensed Firearms Sales in Violation of Federal Law". HUGGINS signed indicating receipt of the warning notice on May 21, 2019.

32. Initial contact with HUGGINS was made on May 17, 2022. Since this date, all communications with HUGGINS to coordinate the sale/delivery of firearms involved in the case have gone through text or phone calls from (828) 371-0209.

33. The DEVICE is currently in the possession of HUGGINS.

34. Based on my training and experience, and my knowledge of the facts of this case, there is probable cause to believe that the DEVICE may contain evidence of federal firearm violations, including 18 U.S.C. § 922(a)(6), false statement as to a material fact to FFL; 18 U.S.C. § 922(a)(1)(A), dealing firearms without a license; 18 U.S.C. § 922(a)(5), transfer to out of state resident; and, 18 U.S.C. § 922(d)(1), sale/transfer to a prohibited person.

35. In my training and experience, I know that people often utilize cellular phones to communicate before, during, and after a criminal act occurs with multiple people involved.

36. Based on my knowledge of this case, and my training and experience—including the fact that I and other agents and officers have often found incriminating evidence on cellular phones found in the possession of unlawful firearm buyers and sellers—there is probable cause to believe the DEVICE will contain, among others, the following: incriminating text messages regarding the purchase/sell of firearms; photographs (photographs are often sent to potential buyers to entice sales); photographs of the sellers and buyers themselves either holding firearms; logs of telephone calls and text messages; and GPS data. Such evidence will allow law enforcement to examine the scope of the subjects' illegal activities and identify possible coconspirators, among other things.

## **TECHNICAL TERMS**

37. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or cellphone, or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include:

10

storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. IMEI stands for International Mobile Equipment Identity. It is a 15-digit number unique to each mobile device.[3]

c. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

d. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video,

---

[3] https://www.verizon.com/articles/what-to-know-when-buying-a-used-phone/

or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

e. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

f. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication

12

devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

38. Based on my training and experience, and research, I know that the DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the DEVICE and the scope of the subjects' illicit activities.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the DEVICE. This information can sometimes be recovered with forensics tools.

40. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

13

the DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42. *Manner of execution.* Because this warrant seeks only permission to examine a device, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

43. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the DEVICE described in Attachment A to seek the items described in Attachment B.

*This affidavit has been reviewed by Assistant United States Attorney Alexis Solheim.*

Respectfully submitted,

/S/ Kevin Allred
Date: July 21, 2022
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and Explosives

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 21st day of July, 2022, at 4:01 PM.

Signed: July 21, 2022

W. Carleton Metcalf
United States Magistrate Judge

# ATTACHMENT A

The property to be searched is a cellphone with assigned telephone number (828) 371-0209 (hereinafter "the DEVICE"), which is currently being utilized by Brent HUGGINS.

This warrant authorizes the forensic examination of the DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on the DEVICE described in Attachment A, involving Brent HUGGINS, from May 2019 to the present, related to:

    a. lists of other phones and persons contacted and related identifying information;

    b. any address book or list of contacts;

    c. any firearm or firearm criminal offense (including conspiracy) related photographs, digital media, and communications, including text messages;

    d. any information regarding the phone user's schedule, travel, or location; and

    e. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.